(5 App. Div. 330; 16 Misc. Rep. 263.)

SOUTHERN BOULEVARD R. CO. v. PEOPLE'S TRACTION CO. et al.

(Supreme Court, Appellate Division, First Department. May 22, 1896.)

STREET RAILROADS—SALE OF FRANCHISE—INJUNCTION.

The comptroller of New York City offered a street-railway franchise for sale at public auction (Laws 1890, c. 565, § 93, as amended by Laws 1893, c. 434) to the person who should bid the largest per cent. of the gross receipts from the road. Plaintiff and two others appeared as bidders, and, after several bids had been made by the parties, plaintiff made its last bid of 3½ per cent. The other two competitors continued the bidding until 39 per cent. was reached, whereupon the other bid 97 per cent., after which the bids ran up to nearly 7,000 per cent. The sale was then adjourned until the next day. *Held*, that the comptroller should not be enjoined, at the instance of plaintiff, from proceeding with the sale on the ground that plaintiff's bid of 3½ per cent. was the highest bona fide bid made on the day of the sale, unless it was shown that no bid made thereafter was a legitimate and binding offer.

Appeal from special term, New York county.

Action by the Southern Boulevard Railroad Company against the People's Traction Company and others to enjoin the sale by defendant Fitch, as comptroller of the city of New York, of the franchise to operate a street railway in said city. The complaint was dismissed, and plaintiff and defendant North New York City Traction Company appeal. Affirmed.

The opinion of Mr. Justice BEEKMAN at special term is as follows:

Pursuant to the requirements of section 93 of the railroad law, as amended by chapter 676 of the Laws of 1892, a sale at public auction was held on the 9th day of October, 1895, by the comptroller of the city of New York, of a franchise for the construction and operation of a street railroad in said city which had been duly created under a resolution of its common council. The section in question required that the sale should be made "to the bidder who will agree to give the city the largest percentage per annum of the gross receipts of such corporation, with a bond or undertaking in such form and amount and with such conditions and sureties as may be required and approved by the comptroller or other chief fiscal officer of the city, for the fulfillment of such agreement and for the commencement and completion of its railroad within the times hereinafter designated, according to the plan or plans, and on the route or routes fixed for its construction." The right to bid at any such sale is limited to duly incorporated railroad corporations of this state, organized to construct, maintain, and operate such a road, and who, at least five days prior to the day fixed for the sale, shall have filed with the comptroller a bond, with sufficient sureties, to be approved by him, conditioned to pay to the city the sum of $50,000, as liquidated damages, should such corporation, being the successful bidder, fail to comply with the terms of sale, or to complete and operate such railroad within the time provided by law, namely, three years after the creation of the franchise.

The plaintiff and the defendants, the North New York City Traction Company and the People's Traction Company, are corporations coming within the description of the statute, and, they alone having filed the bond necessary to qualify them to bid, were the only competitors at the sale. By the terms of sale, which in that regard followed the requirements of section 95 of the railroad law, the successful bidder is also required to pay to the city annually, for the first five years 3 per cent., and thereafter 5 per cent., of its gross receipts, in addition to the percentage bid by it upon the sale. On the day above mentioned all three of these corporations were duly represented before the comptroller, the bidding was opened, and proceeded on the part of all of the competitors, until the plaintiff, having bid 3½ per cent. of the

gross receipts, retired from the field, and thereafter the bidding was continued by the two defendant corporations alone. In this contest the bids were repeatedly raised until, one of $39^{12}/_{16}$ per cent. having been made by the North New York City Traction Company, the People's Traction Company followed with a bid of 97 per cent. of the gross receipts for the first five years, and 95 per cent. thereafter, which, in view of the additional percentages required to be paid under section 95 of the railroad law, was equivalent to an agreement to pay 100 per cent., or the entire gross receipts of the road. This was immediately raised by the other company, and, although the representative of the People's Traction Company thereupon protested against the receipt of any further bids, on the ground that the percentage of the gross receipts which by law was to form the basis of bidding meant a portion of such receipts, and that, when the entire gross receipts had been offered, no further competition was possible, the comptroller still continued the sale, receiving further bids from both companies, until, at the close of the day, a recess was taken until the following day, with the last bid made by the North New York City Traction Company standing at $6{,}975^1/_8$ per cent. of the gross receipts. The proceeding had degenerated into a farce.

Before the bidding could be resumed this action was brought, and an injunction obtained restraining the comptroller from proceeding further in the matter until the determination of the suit. The plaintiff alleges that it refrained from bidding after its bid of $3^1/_2$ per cent. had been made, because it believed that the bidding thereafter by the two defendant corporations was not made in good faith, nor with the intention of actually paying the percentage of gross receipts bid by them; that, after the bids were raised above 20 per cent., and particularly after they were raised above $39^{12}/_{16}$ per cent., none of said bids was bona fide; that the plaintiff's bid of $3^1/_2$ per cent. was the last bona fide bid; and that a continuance of the bidding would defeat the intent and purpose of the statute under which the sale was being held. Upon this, judgment is asked that an injunction should issue restraining the defendant corporations from bidding further; that the comptroller should be directed to award the franchise in question to the plaintiff upon its bid of $3^1/_2$ per cent.; or that the proceedings upon the sale should be adjudged to be void, and a new sale ordered. The defendants having put in issue the allegation in respect to the bona fides of the bidding, the plaintiff, upon the trial, offered evidence bearing upon the cost of construction and operation of surface railways, the resources of the defendant corporations, and other circumstantial evidence tending to show the impracticability, from a financial point of view, of running a road subject to the burden of paying any of the heavy percentages bid by them. Evidence was also given in respect to the manner of bidding at the sale, and it was also shown, on cross-examination of the representative of the People's Traction Company, that, while his bid of 100 per cent. of the gross receipts was made in good faith, and in the expectation of complying therewith should the franchise be awarded to his company, his further bids were made after he had protested against the receipt of any other bids, in order to prevent the franchise from being knocked down to his competitor. Upon this line of proof, the plaintiff now claims that it is entitled to judgment.

I do not think, however, that a case has been at all made out to justify such a conclusion. Laying out of consideration all of the bids which were received after the full amount of the gross receipts had been offered, I fail to find in the proofs sufficient evidence of bad faith to sustain the claim of the plaintiff that it has been aggrieved in any way by the action of the defendants. The allegations of the complaint in reference to the bona fides of the bids between that of $3^1/_2$ per cent., made by the plaintiff, and that of $39^{12}/_{16}$ per cent., made by the North New York City Traction Company, are somewhat contradictory. The charge is that the bids ceased to be bona fide only "after the bids were raised above 20 per cent., and particularly after the bids were raised above $39^{12}/_{16}$ per cent." This is hardly consistent with the claim, made by the plaintiff, that its bid of $3^1/_2$ per cent. was the last bona fide bid made at such sale. At all events, there is nothing in the proofs from which it may be found or inferred that there was any lack of good faith on the part of the bidders, certainly until the bidding had far outstripped that of the plaintiff, and had passed the limits mentioned in the complaint. It is impossible, therefore, to see how the plaintiff

has been aggrieved in any actionable sense by the matters of which it complains. The action is purely a private one. The plaintiff is in no sense whatsoever interested in the matter from a public point of view,—at least, in this form of action,—and unless it can show some peculiar injury or damage, some right for the protection of which it is entitled to appeal to the courts, the action is not well founded, and the complaint must be dismissed. The only right which the plaintiff possessed at any time in respect to the franchise in question was to bid at the sale, and to receive the franchise in case its bid was the highest. It duly qualified itself to bid, attended the sale, and made its bids, but retired from the competition, unwilling to hazard a higher offer than that which it had made. It now seeks to have the entire proceeding before the comptroller set aside upon allegations of bad faith. Under the peculiar circumstances of this case, however, the evidence of bad faith should be most clear and convincing to justify any interference on the part of the courts. The statute itself has provided what was, at all events, deemed sufficient by the legislature to insure good faith, by requiring each bidder to give security satisfactory to the comptroller, to the extent of $50,000, as a guaranty of compliance with the terms of sale. In addition to this security, it is also provided by the statute, as well as by the terms of sale, that the successful bidder shall give a bond or undertaking in such form and amount, and with such conditions and securities, as may be required and approved by the comptroller, for the fulfillment of the agreement. A double form of security is thus provided for,—one, the qualifying bond of $50,000, which each bidder must give, and which is violated upon the failure of the successful one to comply with any of the terms of sale, including that which demands that it execute the second bond or undertaking; and the latter, which may be in such amount and with such conditions and securities as the comptroller may determine. Should the successful bidder, therefore, immediately after the sale, fail to furnish this additional security, the city is in a position to prosecute the bond which was first given. If the second bond or undertaking is executed, the security of the city for the performance of the terms of sale and the construction and operation of the road is abundant and fairly compensatory for a failure on the part of the purchaser to carry out his agreement. In view of these provisions, the evidence of bad faith or lack of purpose to construct the road and pay the percentage bid should be very much stronger than this case presents to justify the action of the court invoked by the plaintiff. Certainly the contention of the plaintiff in this regard is not only unsupported, but is strongly opposed by the learned counsel for the comptroller.

What I have said, however, does not apply to the bidding which took place after the payment of the entire gross receipts of the road had been tendered. It was admitted by the representative of one of the competitors that he had no expectation whatsoever of paying the enormous sums represented by his bids, and the farcical procedure which followed, terminating in the bid of nearly 7,000 per cent., is upon the face of it such an affront to the reason as of itself to call for the conclusion that neither of the defendant corporations was then acting in good faith. In extenuation of his conduct in this respect, the representative of the People's Traction Company claims and insists that, when he bid 100 per cent. of the gross receipts, he had then reached the maximum limit allowed by law, and by virtue of the statute was then the highest possible bidder, and that it was mandatory upon the comptroller forthwith to have so declared, and to have terminated the proceedings upon the sale. This question has been thoroughly discussed before me by counsel, and while, perhaps, it is not necessary that I should pass upon it, in view of the conclusion to which I have come that the complaint must be dismissed on the ground that the plaintiff has not shown itself to be aggrieved, I think it expedient that I should do so in view of what seems to be the importance of contributing towards a solution of the situation with which the comptroller is confronted.

The claim is made, on one side, that when the statute uses the phrase "the largest percentage per annum of the gross receipts," it means the largest percentage per annum on the gross receipts. The difficulty with this construction, however, is that it requires us to hold that, when the legislature used the word "of," it intended to use it in the sense of "on." In other words, an expression which is exact, grammatical, and sensible, having a definite meaning, is to be wrested from that meaning by giving it a signification which, taking the words

in their ordinary sense, it will not bear. A percentage "of" a sum means a portion of that sum. A percentage "on" a sum signifies the measure of what the sum in question will yield, and in no sense whatsoever imports a portion of such sum. The theory evidently was that the value of the franchise to be sold would be such that railroad companies seeking to profit by it would be willing, as a fair business venture, to pay out of their gross receipts a larger portion than the fixed percentages of 3 per cent. and 5 per cent., mentioned in section 95 of the railroad law, and be still entitled to expect a net receipt representing a reasonable profit upon the enterprise. This was the situation with which the legislature undertook to deal, and in enacting the law in question the gross receipts were taken as the natural source out of which were to come. the rental value of the franchise, represented by the percentage to be paid to the city, the expenses of operation and fixed charges, and the profit upon the investment for the stockholders. This certainly seems to be the most rational view to be taken of the scheme of the law, and, if so, should be taken to express the legislative intent. A consideration of the almost necessary consequences of the other construction contended for seems to demonstrate its fallacy. How can a percentage exceeding 100 per cent. "of," or, for the matter of that, "on," the gross receipts, ever be realized? Would not any railroad corporation, controlled by men of the most ordinary intelligence, find it more profitable to throw open its line to the free use of the public, without charge, rather than collect fares and pay to the city more than it received? If the percentage to be paid exceeds the gross receipts, the obvious means of escaping the exaction would be to cease to have gross receipts, and this would be precisely what every railroad corporation purchasing a franchise on such ridiculous terms would do. There is nothing in the statute which requires such a corporation to charge any fares, or to take any steps whatsoever to realize any receipts from the operation of the road. All that we find on the subject is a prohibition against charging more than a certain fare. The courts will not impute to the legislature an intent productive of absurd results, such as necessarily follow from the meaning sought to be given to the statute. But the subject is not without light from judicial decision. Mayor, etc., of New York v. Twenty-Third St. Ry. Co., 113 N. Y. 311, 21 N. E. 60. In that case the Bleecker Street & Fulton Ferry Railroad Company was required by the legislature (chapter 647 of the Laws of 1873) to "pay into the treasury of the city of New York 1 per cent. of the gross receipts of said company." In considering the effect of this requirement, Judge Earl, who delivered the opinion of the court, says (page 319, 113 N. Y., and page 60, 21 N. E.): "The gross receipts mentioned in the act of 1873 were the gross receipts of the Bleecker Street & Fulton Ferry Railroad Company received for fares upon its road. It could have no other receipts, and 1 per cent. of those receipts it was bound to pay to the city of New York,—not a sum equal to 1 per cent., but so much of the gross receipts. Hence, it would receive 1 per cent. of all the fares paid to it, to and for the use of the city, under the obligation to pay it to the city."

In fact, it seems quite clear that the construction which attributes to this phrase the meaning of a part of the gross receipts is not only the most rational one, but also that which is most advantageous to the city; for it was upon this view of its meaning that the court of appeals, in part at least, justified its holding that the Twenty-Third Street Railway Company, in leasing the franchise of the Bleecker Street & Fulton Ferry Railroad Company, was obliged to account to the city for the percentages which the former road had been required to pay. I am therefore of the opinion that no bidding beyond the entire gross receipts is admissible under the statute, for there is no basis upon which it is possible for the comptroller to receive or accept any such bid. Within the limits, however, of the gross receipts, the bidding is free and unrestricted by the statute, and it therefore cannot be said that a bid of the entire gross receipts is without statutory sanction. In fact, it would be impossible for either the comptroller or the courts to assume to define a limit, inside of the maximum of the statute, beyond which no bidding should go. It is to be presumed that the bond of $50,000 which is required to be given will be an adequate protection to the city in such a case against reckless and irresponsible action.

The defendant the People's Traction Company contends that it was justified in offering the entire gross receipts of the road by the fact that it intends to

consolidate with another road known as the New York, Westchester & Connecticut Traction Company, which has a franchise for the construction of a railroad from the Byram river to the Bronx river, and which expects to connect with and use the lines of the People's Traction Company, so as to reach the elevated and surface railroads on Manhattan Island. The New York, Westchester & Connecticut Traction Company holds its franchises free from any obligation to pay anything whatsoever for their use, and is entitled to charge a fare of 25 cents for carrying its passengers from the Byram river to the Bronx river. The claim is that its expectations of profit from its road are such that it could afford to give to the city of New York its entire gross receipts from the road constructed under the franchise offered for sale, and that the necessity of controlling this franchise is such that, without it, its road would be valueless. It is also claimed that the expense of constructing and equipping the connecting line, which is the subject of the sale, would under such circumstances be reduced to a minimum by reason of the fact that the entire equipment and expense of operation would be assumed by the New York, Westchester & Connecticut Traction Company. The traffic agreements with this company, mentioned in the resolution of the board of aldermen creating the franchise under sale, give serious support to the contention. Whether the expectation thus indulged in is well founded or not, I shall not assume to determine. In fact, it would be impossible to do so from the evidence before me. It is sufficient to say that at least a plausible explanation is furnished to account for the willingness of the People's Traction Company to purchase the franchise on what would otherwise seem to be the most improvident and impossible terms. It also suggests that exceptional cases may very well exist under which it might be profitable to assume such a burden for the purpose of securing an indispensable connecting link with dense centers of population. On the other hand, I am also mindful of the fact that it is likewise possible that the payment of the gross receipts might be lost to the city if the company should throw open such portion of its line for the free use of the public. The increase of the traffic, however, under such circumstances would be so great that it probably would be found more profitable to collect the receipts and turn them over to the city than to pursue the other course. However that may be, the fact that such a result is possible is one of the unavoidable consequences of the unsatisfactory method which the legislature has seen fit to adopt for securing adequate compensation to the city for railroad franchises to be exercised within its borders.

The defendant the People's Traction Company claims affirmative relief in its answer, which it has served upon its co-defendants, and insists that, in addition to dismissing the complaint, the court adjudge that the comptroller award the franchise to it upon its bid of the entire gross receipts. Without stopping to consider other objections which suggest themselves, I do not think such a judgment would be proper, inasmuch as the mayor, aldermen, and commonalty of the city of New York are not parties to the action. In the view which I take of the franchise, it is the property of the corporation. It was created by its own agencies, and the sale is had solely for its profit and advantage. The theory of the statute under which the sale is authorized is that, as the road is to be operated in the public streets owned by the city, an annual rental for such use of the public property should be rendered to the city. The right to be enjoyed is in the nature of an easement created by the city in the public highway, and sold by it to the successful bidder, upon a rental of which the city is to be the recipient. This principle finds clear expression in the case of People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, where the subject is thoroughly discussed, and the cases bearing upon it reviewed. I am therefore satisfied that no relief should be granted, involving the transfer of the franchise, in any action or proceeding to which the city in its proprietary capacity is not a party. While it is true that the comptroller of the city is a party defendant, it must be remembered that he is not the owner of or interested in the franchise, but is only a public officer charged with certain specific duties in respect to the sale, and is no more than an agent for a particular purpose, exercising limited and well-defined powers. I doubt, also, whether the People's Traction Company has as yet qualified itself to demand such a transfer. The statute, as well as the terms of sale, requires that the franchise shall be sold, not only to the corpora-

tion which bids the highest percentage of the gross receipts, but which will also give "a bond or undertaking in such form and amount and with such conditions and sureties as may be required and approved by. the comptroller or other chief fiscal officer of the city for the fulfillment of such agreement," etc. This bond is to be in addition to the qualifying bond of $50,000 above referred to. The proofs are silent upon this subject. It does not appear what bond or undertaking may be required by the comptroller, nor whether the People's Traction Company is prepared to enter into such an obligation, which, it will be observed, may be in any amount (of course, within reasonable limits) which the comptroller may require. It may be that this company has a remedy, which it may prosecute in an appropriate action or proceeding to which the city shall be a party; but it must qualify itself by a proper demand and tender of complete performance on its part, within the requirements of the statute and the terms of sale, before it can properly claim performance on the part of the city or its officers.

In closing, I feel that it may not be inappropriate to call attention to the unsatisfactory condition of the statutory law upon the subject. It has been argued that the North New York City Traction Company has been organized in the interests of the Union Railway Company, a corporation now operating a railroad in the same quarter of the city, and possessing special privileges under chapter 340 of the Laws of 1892. Whether this be so or not, I have no means of determining, but the act referred to at least points out a way by which excessive percentages bid on such sales as the one under consideration may be avoided. Section 1 authorizes the Union Railway Company to consolidate with other railroad corporations, formed or to be formed, and section 4 provides that the percentages to be paid by said company shall be in lieu of all other percentages which any of the roads consolidating with and forming the said Union Railway Company may theretofore be liable to pay on its receipts. As the percentage to be paid by the Union Company does not commence until its average daily earnings amount to $1,700, and is then limited to an annual payment of 1 per cent. of its gross earnings, and an additional annual payment of 1 per cent. for each multiple of $1,700 per day of such average gross earnings, the natural gravitation of less-favored companies will be towards this corporation, and its tariff, and not that established by the auction sale, will ultimately measure the city's receipts from franchises within this territory. With the law in its present condition, it is hardly reasonable to expect fair competitive bidding, or to entertain any well-founded assurance that the city will receive its just share of the profits of such enterprises. This, however, is a matter of which the legislature alone has cognizance. The courts must deal with and apply the law as they find it. It follows, from the views which I have expressed, that the complaint must be dismissed on the merits, with costs. Complaint dismissed, with costs.

Argued before BARRETT, RUMSEY, WILLIAMS, PATTERSON, and O'BRIEN, JJ.

J. M. Tierney, for appellant Southern Boulevard R. Co.

W. F. Sheehan, for appellant North New York City Traction Co.

B. F. Tracy, for respondents.

PATTERSON, J. There are two appeals brought before us in this action. The complaint was dismissed at special term, and from the judgment entered upon that decision the plaintiff appeals. The defendant the North New York City Traction Company answered the complaint, and in its answer claimed certain affirmative relief, which was of such a character as would have necessitated, if it were to be awarded, a final adjudication in its favor against one of its co-defendants, the People's Traction Company. There is nothing properly before the court presented by this appeal of the North New York City Traction Company. It does not appear that its answer was

served upon the People's Traction Company, as is required by law, in order to enable the court to adjudicate any matters in controversy between those companies and involved in the general subject-matter of this suit.    It is not claimed by the North New York City Traction Company that there was error in dismissing the complaint and dissolving the temporary injunction as to it, but only that the action should have been retained in court in order that a final judgment might be made in its favor against the People's Traction Company. Its appeal, therefore, requires no further consideration, and must be dismissed.

The action was brought to restrain a sale by the comptroller of the city of New York of a certain franchise for constructing and operating a surface railroad upon certain streets and highways in the city of New York, particularly mentioned in the complaint, which sale had been duly advertised by the comptroller, who attempted to make it on the 9th day of October, 1895.    All the necessary requirements of law preliminary to offering the franchise for sale were complied with by the authorities of the city of New York, and three qualified bidders alone appeared to bid for that franchise. They were the Southern Boulevard Railroad Company (the plaintiff), the People's Traction Company, and the North New York City Traction Company.   On the 9th day of October, 1895, the comptroller of the city of New York attended at the time and place named in the advertisement of sale, and offered, through an auctioneer, the franchise for sale.    It was announced before the bidding began that the franchise would be disposed of to the bidder who should agree to give the largest percentage of its gross receipts to the city as required by article 4 of the railroad law,[1] and should also furnish a bond or undertaking in such an amount and form as might be required and approved by the comptroller for the performance by the successful bidder of the terms of his bid, and for the commencement and completion of the railroad within the time designated by law, and certain other provisions.    It was also announced at the sale by the comptroller that, in addition to the percentage of gross receipts referred to, the successful bidder would be liable to pay annually into the city treasury for the first five years 3 per cent., and thereafter 5 per cent., of its gross receipts, as required by section 95 of the general railroad law, and that no bid would be accepted unless it should be for a percentage additional to that provided by such law. After the announcements were made, the bidding was opened by the representative of the People's Traction Company, the offer being one-eighth of 1 per cent. of gross receipts in addition to the percentages required by law.    Advances were made in the bids in fractions of 1 per cent. until a bid of $3\frac{1}{2}$ per cent. was offered by the plaintiff, the Southern Boulevard Railroad Company, after making which bid that company made no further offer.    Thereafter the bidding was confined to the representatives of the People's Traction Company and the North New York City Traction Company.    The latter com-

---

[1] Laws 1890, c. 565, § 93, as amended by Laws 1893, c. 434.

pany offered 39¹²/₁₆ per cent., whereupon the People's Traction Company offered 97 per cent. for the first five years and 95 per cent. thereafter, which was explained and understood to be a bid in excess of and in addition to the 3 per cent. for the first five years and 5 per cent. thereafter, as hereinbefore mentioned; whereupon the representative of the North New York City Traction Company bid 97½ per cent. for the first five years and 95 thereafter, which was followed by the representative of the People's Traction Company bidding 100 per cent. of the gross receipts of the company, and the North New York City Traction Company's representative withdrew its bid, and also bid 100 per cent. After this point was reached, the bidding became wild, and seemingly extravagant, and by leaps went from 100 to 1,000 per cent., thence to nearly 7,000 per cent., on gross receipts. The sale was then adjourned until the following day. In the interim, and before the sale could be resumed, this action was brought, and an injunction restraining further proceedings by the comptroller in the sale of the franchise was applied for and granted. The right to relief claimed by the plaintiff is based upon the assertion that it is entitled to the franchise as the legitimate purchaser thereof at the sale, and that its bid of 3½ per cent. of the gross receipts was the highest valid and lawful bid made, and that all bids subsequent to that were put in in bad faith, and without the intention to abide by them, and that the facts with reference to the condition and situation of the other competitors for the franchise were such as to indicate that they neither had the intention nor the ability to comply with the terms of their bids, or to become actual purchasers in good faith of the franchise; and the plaintiff prayed for an injunction restraining the comptroller from proceeding with the sale and enjoining the two other competing corporations from further bidding at such sale, and also praying that the comptroller be directed and required to award the franchase to the plaintiff upon its bid of 3½ per cent., or, in the alternative, that the sale be adjudged null and void throughout, and that it be discontinued and abandoned, and that the comptroller be directed to advertise anew the sale of the franchise, or for other relief. The answer of the People's Traction Company put in issue the allegations of the complaint respecting its situation and condition and the bona fides of its bid, and set forth that its bids were legitimate, and made with the intention to acquire the franchise upon the terms of bidding; at least in so far as the offer of its gross receipts was concerned. It is not necessary to refer to other averments of the answer.

Upon these pleadings and upon the proofs as they appeared at the trial at the special term, the issue between the parties was a very narrow one, and it would subserve no useful purpose to widen it here, or to decide anything more than the particular question which arises concerning the plaintiff's right to relief under the undisputed facts appearing in the papers. The only ground upon which the plaintiff can claim in this particular action the right to the interference of the court is that it has established that it was entitled to the award of the franchise by reason of its having been the highest

bidder making a bona fide bid on the day that the franchise was offered for sale. It appears incontestably that it made no higher bid than 3½ per cent. of its gross receipts in addition to the annual percentages required by law. In the face of that fact it became necessary for it to show that every advance in the bidding beyond 3½ per cent. was not a legitimate and binding offer. It did not again compete after this bid of 3½ per cent. was increased by another bidder. The record states: "The bidding proceeded between these three companies until a bid of three and one-half per cent. was offered by the Southern Boulevard Railroad Company, and from this point it was confined to the two other companies. A bid of the North New York City Traction Company of thirty-nine and twelve-sixteenths per cent. had been offered and received." We have examined the record to find some evidence of any of the intermediate bids between 3½ per cent. and $39^{12}/_{16}$ per cent. having been fraudulent or irregular, but we have failed to discover anything to impeach them, and this consideration is sufficient to dispose of the plaintiff's appeal, and to lead to the affirmance of the judgment, based, as it is, upon the decision of the court that the plaintiff offered to pay only the amount of its bid of 3½ per cent. and the additional statutory percentages, after which offer other and larger percentages were bid and agreed to be paid by the competing defendant corporations, which bids were made in good faith. We think it is too clear for argument that the plaintiff, upon its own showing, had no standing in court to assert any right in this action.

Our attention has been called to certain matters contained in the opinion of the learned judge at special term relating to the legal effect of the bidding after it had reached 39½ per cent. of the whole amount of the gross receipts. These matters are important, but a consideration of the character and effect of that bidding was not necessary to the decision of the court, regard being had to the real ground upon which the conclusion it arrived at concerning the right of the plaintiff to maintain the suit was based. As it was unnecessary to the decision by the court below, so also is it unnecessary that we should take that subject into consideration, and what was said by the learned judge at special term concerning it in his opinion is not to be regarded as anything more than the expression of his personal views, the correctness of which we refrain from passing upon.

The judgment of the court below in dismissing the complaint was right, and is affirmed, with costs. All concur.